UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

SEP 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| Steven Ivey, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CA No. 05-1147 *EGS* |
| V. | ) | |
| | ) | |
| National Treasury Employees Union, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION AS PER FRCP RULE 60

**Introduction:**

As per FRCP 60 the plaintiff, Ivey, is requesting the Court reopen the

above caption case. The request is due to (1) newly reveal issues of perjury and false

records regarding the connection between the defendant, NTEU, and the

US Treasury, et al.; (2) the further review of abuse of discretion of Judge Sullivan for the

present case and related case 04-0214, DC District; and (3) the newly revealed

inaccuracies and misrepresentation of the NTEU in citing the Fair Labor Relations

Authority, FLRA, as deciding "exclusive remedy," because the FLRA did not resolve, (a)

the fact that the NTEU did not inform the plaintiff, Ivey, of the appeal right to the FLRA,

(b) the  establishing of proper jurisdiction over the allegation occurring towards the

plaintiff as a private citizen of North Carolina, or ( c) the continuous effect of perjury and

subornation of perjury.

1

**Argument:**

**I. Perjury/False Records/Subornation of Perjury Issues:**

Attachment # 1 has been used repeatedly by the US Treasury in it's defenses against claims of Ivey for violations of Title VII Civil Rights code; departmental regulatory violations, and violations to taxpayers' documents. The attachment has been used in making decisions on the validity of Ivey's claims from the time it was included in the EOP file until the present. Therefore, it has caused damage in a continuous basis until the present. Consequently, it involves the NTEU as a partner in the alleged racial call, which in turn results in damage to the plaintiff as paralleling that caused by the US Treasury.

Ivey has denied involvement with the call from it's inception. Ivey has requested verification from the Treasury, and the NTEU, for Lisa Porter and Angela Strong, so as to verified their roles. To date neither of these has supplied any affidavits and/or declaration that substantiates the allegation of the supposed call. With attachment #8 Ivey submitted the allegations of perjury in related case 07-0748, DC District. However, in reply from Paulson, et al., attachment # 9, PP. 5-6, answers 10- 25, Paulson has denied the allegations. This generates new evidence that is contrary to the NTEU's initial claim of denials of attachment # 1. Therefore, the initial decision was under-minded by the effects of perjury between the NTEU and Paulson, et al. when making initial determinations of Ivey's claims. *(For attachments # 8 & #9 the below Lines 1- 8, analysis was included.)*

From Robert Hall's testimony this call was to have occurred around March 29

2

or 30, 2001, approximately one month after Ivey was terminated from the IRS/ Treasury

at the Chamblee, GA, tax processing center. Ivey has made and filed claims of wrongful

termination based on his reporting the above listed claims and not following proper rules

of removal of an employee. The reason for Ivey's termination as cited by the

IRS/Treasury was because of "poor rating." The attachment # 8, related case 07-0748,

list the problems with the rating system that affected Ivey's rate score / performance and

how these problems were blamed on Ivey; the same for all data transcribers. To some

degree these problems continue till the present day affecting approximately 500 data

transcribers to some degree at some level.

      Ivey had no contact with Lisa Porter or Angela Strong while employed at the

Chamblee, GA, IRS Center or since being employed at the site. Ivey never talked with

them nor knew of them in any capacity while at the IRS center or otherwise. The only

NTEU rep Ivey ever talked to directly at the center was Doug Van Buren which was

limited to the first month of employment in February 1999 concerning complaints about

Kelly Mancle, a unit manager. Ivey had no other contact with Doug Van Buren until

Robert Hall requested him at the March 5, 2001 meeting as reference with attachment # 2.

Ivey did not request Doug Van Buren to be present as Robert Hall wrote with

attachment #3. Under the circumstances of terminating Ivey for "poor" rating render the

NTEU powerless as stated in attachment # 4. Consequently, Lisa Porter and Angela

Strong would not have a working identification of Ivey so that they could make such a

call ID of Ivey. More significantly, all incoming and outgoing calls at the IRS/Federal

Processing Center are recorded/ documented so the call could be checked according to the

3

phone records. When first employed this was given as a warning to employees in case they were to talk about private issues while using the phones.

**Lines 1 & 2:** This represents hearsay on the part of Lisa Porter and Robert Hall which amounts to gossip in order to discredit Ivey.

**Line 3 :** Ivey did not make such a call to NTEU, therefore, no conversation with Angela Strong. If there was such a call it does not explain how Angela Strong would have identified the caller as Ivey from that of a "crank" caller.

**Line 4 :** During the meeting of attachment #2 in which Doug Van Buren was improperly present, Ivey told him that the IRS/Treasury was trying to terminate him because of reporting the above violations and that Ivey had done so to the above listed agencies. With this in mind, why would Ivey call the NTEU to say he was terminated for his beliefs ? This, also, occurred during a time when Ivey was contacting the EEOC and OSC . The term "beliefs" is strange because it suggest a more religious reasoning of views. There are such things as improbable character traits; for Ivey this would apply with the term "beliefs", equally so for talking to what would be a stranger about such "beliefs."

**Lines 5 & 6 :** This question and statement for Ivey are highly usual because it evokes a role of Angela Strong , though a stranger to Ivey, a more personal familiar role to Ivey. It should be noted that Ivey had come to the understanding that the NTEU was ineffective in resolving complaints before Ivey was terminated and understood that Doug Van Buren was not suppose to be present as with attachment #2 meeting where he was coercing Ivey to sign away his rights. Consequently, this lends to much credibility to the NTEU in that

4

approximately one month after Ivey's termination, he would have trusted any contact with the NTEU or think that the NTEU would do anything to assist him. All this in light of the accusation of some personal conversation about "beliefs."

The use of the racial and sexual language was intended by the NTEU to discredit Ivey in order to intimidate, retaliate, and give support to the Treasury in defense of Ivey's claims against the Treasury. The idea of not taking orders was to provoke a defiant character of Ivey to discredit him and negate the fact that Ivey refused to participate in changing taxpayers' documents, as discussed in the attached letter of the FLRA charges, AT-CA-07-0311, against the Treasury. Once again this was an attempt to dissuade and discredit Ivey.

**Lines 6 & 7**: Ivey would not think that the union president would be sitting around ready to take phone call or more particularly to meet. I ma sure these would have to be arranged for anyone. These may be possible events but not probable as a rule. As stated above Ivey would not have contacted the NTEU since by this date the NTEU had established a behavior mistrust for Ivey.

**Line 8** : This statement signifies that the document is basically hearsay which under **FR of Evidence § 802** means that it is not admissible in making decisions against Ivey.

There are many problems that are generated by attachment # 4. Though the document has been cited as having occurred at the end of March 2001 it has been used by the Treasury in administrative and judicial reviews of Ivey's claims of MSPB whistle-blowing and EEOC Title VII employment discrimination and harassment. Because of this extensive use it has resulted in damage to Ivey on a rolling basis until the present

5

date. The Treasury has refused to resolve the validity or provide verification for it's inclusion in any proceedings. The responsibility of damage to Ivey is, also, that of the NTEU, because the NTEU has refused to supply testimony from the NTEU reps involved. These circumstances affect the limitations that the FLRA would apply for jurisdiction because to perpetuate what is essentially a false record involving perjury and forged evidence means that there would be more charges than the initial charges that were produced in March 2001 as long as it is used without being substantiated. Depending of where the determination of blame falls there are charges subornation of perjury at the very least against the responsible person of the Treasury.

Ivey has denied any involvement with attachment # 4 and supplied his phone record during the time in question, attachment # 6. From this phone statement there can be seen that no calls were made for the days that NTEU/ Treasury claims. The calls to Acworth, GA, were to a co-worker, Susan Karimi. Ivey and Susan Karimi exchanged phone numbers during employment at the center. It was normal to call her because Ivey and Susan did call each other over the weekends during employment and after. Julie and Donna were the only two other employees that exchanged phone numbers mutually with Ivey. In March of 2001, the Thursday and Friday as referenced in attachment #4, line 3, would have been the 29th and 30th. From Ivey's phone bill there are no calls made on the 29th and of the calls on the 30th none were to the NTEU. Should the NTEU state that the alleged "racial" call occurred from another phone then it should provide such proof. It should start with the records at the IRS center. This raises the fact that since Angela Strong made the accusation, the burden of proof rest with her and the NTEU.

6

Because Angela Strong reported that Ivey made this alleged call the initial questions start with her. There can be, thus, two scenarios for Angela Strong (1) that she denies the incident ( the NTEU has with attachment #5 denied involvement with the call) and (2) she can state that she confirms that Ivey called her at the NTEU as stated.

For the first (1) scenario the burden of proof would then shift to Robert Hall for questioning. In doing so it would initially make Robert Hall and the Treasury responsible for the production of this false document creating violations of perjury and forging evidence. Additionally, because there is hate speech involved, it would make the crimes hate crimes. This is, thus, an amended charge against the Treasury.

It is reasonable to conclude that Robert Hall and the Treasury would deny the any wrong doing with attachment #4, so the burden of proof would then fall to Lisa Porter. However, Robert Hall and the Treasury would be guilty at the minimum of perpetuating damaging unsubstantiated negative claims against Ivey during an investigation for violations under MSPB and the EEOC, because attachment # 4 was not properly verified in order to protect Ivey. The is an act of defrauding official reviews.

For the second (2) scenario Angela Strong can state that she did report the call as given in attachment #4, but would then have the burden of proof. The NTEU has refused to supply such proof or any testimony from Angela Strong. The NTEU would also be contradicting itself, because for the purpose of dismissal with civil action of attachment # 5, the NTEU denied any involvement with attachment # 4, resulting in the changing of Angela Strong's story. The charges of hate crimes as mentioned above would then, also, apply to the Lisa Porter, Angela Strong, and the NTEU.

7

From this point it can be seen that there is suspicion against the NTEU for not taking any action against the Treasury for improperly involving Lisa Porter and Angela Strong and the attacks to Ivey.  This suspicion is compounded by the fact that the NTEU has refused to provide testimony from Lisa Porter and Angela Strong.  This has created continual damage to Ivey to the present date for its use in related investigations and civil actions., with the US Treasury/Paulson denying that the incident is perjury on their part.

The NTEU's accusations imbedded in a false report of Ivey's alleged activities demonstrates the interfering of the NTEU in the Ivey's efforts to resolve matters with the US Treasury as was being reviewed by the EEOC.   Allegations of wrongful dissemination of information harmful to reputation of former governmental employee combined with denial of re-employment in government job states compensable due process violation.   Bastel v. Federal Aviation Administration (1984, App DC 223 US App DC 297, 725 F 2d 1403).The perjury/false records contributed in the denying of Ivey due process through misrepresentation.

## II. Abuse of Discretion:

There was a rush to judgment on the part of Judge Sullivan in the initial determination for this present case, 05-1147, Ivey v. NTEU .  This has resulted in suspicious, behavior and motive, in decision making, particularly surrounding attachment #1; the "racial call" allegation.  Additionally, filed with this "Motion as per Rule 60" is a " Motion to Reassign Judge."  In Ivey's request to "reassign judge" he cites the fact that Judge Sullivan had in a prior related case miscalculated the impact of attachment #1 with regards to the FOIA/Privacy Act violations.  Therefore. when such

8

disregard was continued in the present case there is a pattern of behavior negatively

effecting Ivey. This represents an abuse of discretion pointing to misconduct.

As stipulated, further, with <u>Baker v. Dir. United States Parole Comm'n</u> ,

916 F. 2d 725, 727 (DC Cir 1990) (per curiam), the issue of this case as having merit is

questioned. The NTEU's improper involvement is prevalent and directed towards Ivey

creating negative and adverse effects on the appellant and his reputation; this fact

represents merit. In the dismissal and failure to continue processing the case, herein,

effectively affirmed the allegations of NTEU representative, Angela Strong, since she

states that Ivey called her, where she in turn told Lisa Porter. This is the "Court's" action

of taking Angela Strong's word over the that of Ivey. Consequently, for the NTEU

allegation to be unproven and used illegally by the US Treasury, damages Ivey and with

the "Court," it , further, denies the Ivey due process and equal protection under the law.

This combined with the NTEU in violation of the Ivey's Fifth Amendment claims

demonstrates a reasonable possibility to prevail. Therefore, an abuse of discretion was

exercised against Ivey.

Implication of liberty interest is within meaning of Fifth Amendment.

<u>Perry v. FBI</u> (1985 CAT Ill, 759 F 2d 1271, ALR Fed. 563).Critical comments contained

in the confidential personnel files, not subject to public disclosure cannot infringe on

individual's liberty interest. <u>Hewitt v Garlicky</u> (1986, CA9 Wash.) 794 F 2d 1373, 1

BNA IER Vas 753. Thus given the above there is a denial of equal protection under law

causing suspicions of Judge Sullivan, and reasoning for to re-open the present case.

**9**

**III. Response of the FLRA:**

           The FLRA, as having been cited as the "exclusive remedy" in the initial decisions of the present case, was presented with the circumstances of Ivey's claims. The claims can be divided into three areas, (1) what interaction Ivey had with the NTEU during employment, (2) the improper involvement of the NTEU in removal of Ivey from the IRS/US Treasury, and, (3) the actions of the NTEU while Ivey was a private resident of North Carolina with no employment connection with the IRS/US Treasury or the NTEU.

           Though the FLRA was given  all the factual issues and circumstances as presented for the present case and for related claims against the Paulson, et al.,  it cited the requirement that such claims be filed with the FLRA within 6 months of the occurrence.  However, this generates two significant discrepancies (1) if the NTEU is citing that the FLRA has "exclusive authority" over the processing of Ivey's complaints then it should the NTEU should have informed Ivey of such appeal rights to the FLRA, and (2) since the alleged "racial call," attachment #1, occurred after Ivey was employed with the IRS/US Treasury residing in NC, therefore, not the jurisdiction of the FLRA because the NTEU, a private entity acted/effected a private citizen not in the NTEU's jurisdiction for subject matter and venue. The FLRA did not resolve these two areas though presented with them. Therefore, the  resulting fact is that the FLRA did not establish itself as the "exclusive remedy" for Ivey's claims and subsequent, initial decisions.   This, in turn, presents new evidence of the misrepresentation of the NTEU to the Court while making dismissal determinations. Consequently,  these new issues

generated from recent evidence from the FLRA raises the question of a requirement of the NTEU to notify an employee of their appeal rights, particularly if it is to participate in activities not within its intended mission.

**Conclusion:**

The NTEU has committed issues of perjury through false reported allegations to the IRS/US Treasury. Because of such discrepancies that are produced the Court has misrepresented itself in the initial decision to dismiss the present case. Because there has been a pattern of accepting the perjury and false evidence in several case, Judge Sullivan has abused discretion in decision making, resulting in suspicious behavior and motives. Though the FLRA, was cited as "exclusive remedy," the FLRA when presented with such did not confirm exclusive authority. This points to the failure of the NTEU to notify an employee of such right of appeal. Moreover, the FLRA did not establish itself to have jurisdiction over the NTEU actions to a private citizen and jurisdiction in question. The collected effects perpetuated, from attachment #1, hate speech in the commission of hate crimes, as have been allowed and not fully realized. Whether, separately or in combination the above issues have given cause to re-open this present case for further processing, as per FRCP Rule 60.

11

# Certification of Service

The attached document was sent by certified mail to:


Office of the Clerk
US District Court for DC
US Courthouse
333 Constitution Ave, N.W.
Washington, DC, 20001

And regular mail to:


Gregory O'Dunden
NTEU
1750 H Street, NW
Washington, DC, 20006
202-572-5553




*9 - 05 - 07*
Date

Steven Ivey
Plaintiff